UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 9, 2014
```

------------------------------X

ANNA EFIMOVNA KHALDEI,　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　　　Plaintiff,　　　　:
　　　　　　　　　　　　　　　　　:　　　　No. 10 Civ. 8328 (JFK)
　　-against-　　　　　　　　　　:　　　　**OPINION & ORDER**
　　　　　　　　　　　　　　　　　:
KALMAN KASPIEV,　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　　　Defendant.　　　　:
------------------------------X

Appearances

For Plaintiff Anna Efimovna Khaldei

    LAW OFFICE OF DANIEL J. ROTHSTEIN, P.C.
    By: Daniel Rothstein
    PORZIO, BROMBERG & NEWMAN P.C.
    By: Joshua Abramson

For Defendant Kalman Kaspiev

    PROSKAUER ROSE LLP
    By: Margaret Dale
        Victoria Loughery


**JOHN F. KEENAN, United States District Judge:**

    In this diversity action, Plaintiff Anna Efimovna Khaldei,

a Russian citizen, and Defendant Kalman Kaspiev previously

cross-moved for partial summary judgment as to Count One of the

complaint. The issue in both motions was the enforceability of

a 2002 judgment of replevin obtained by Plaintiff against

Defendant in New Jersey state court. In its December 5, 2013

Opinion and Order, this Court concluded that an evidentiary

hearing was necessary to determine whether valid service of

process had been effected in the New Jersey action. See Khaldei v. Kaspiev, No. 10 Civ. 8328, 2013 WL 6331794, at *5-6 (S.D.N.Y. Dec. 5, 2013).

The evidentiary hearing was held over three days, primarily to ascertain whether Defendant had lived at the address where service was attempted on January 4, 2001. After the hearing, the parties submitted supplemental briefs, which the Court has duly considered. For the reasons that follow, the Court concludes that Plaintiff has failed to prove that service of the New Jersey replevin action was valid. Accordingly, the 2002 judgment is unenforceable and summary judgment on Count One of the complaint is entered in favor of Defendant.

## I.   Background

### A.   The 2002 Judgment

The Court presumes familiarity with the parties' dispute, the facts of which are set forth in prior opinions. See, e.g., Khaldei, 2013 WL 6331794, at *1-3. Only the most pertinent facts are recounted below.

In December 2000, Plaintiff initiated a lawsuit against Defendant in New Jersey state court to recover photographs and negatives originally entrusted to Defendant as the agent of Plaintiff's deceased father, World War II photographer Evgeny Khaldei ("Evgeny"). (Compl. Ex. E.) Plaintiff attempted to

2

serve Defendant at an address in Long Branch, New Jersey (the "Long Branch Apartment"). This apartment belonged to Marina Otis, a woman with whom Defendant maintained a relationship. In the instant litigation, Defendant admits that he stayed at the Long Branch Apartment sometimes, and that he used it in connection with various matters, including his work with Evgeny. But he represents that he never truly lived there, and was not present at all during January 2001 because he had broken up with Otis in or around the fall of 1999.

In an affidavit filed in the New Jersey court, the process server stated that Otis (referred to both by name and as Defendant's wife) had accepted service of process on Defendant's behalf. (Rothstein S.J. Aff. Ex. 27.) Otis denies that she had accepted the papers. Instead, she represents in a sworn declaration to this Court that she found the papers taped to her door. (Otis Dec. ¶ 11.) She immediately sent the service papers to the clerk of court in New Jersey along with a letter explaining that Defendant no longer lived with her. (Id. Ex. 1.) Notwithstanding her efforts, the Monmouth County Sherriff's Office tried to execute a writ of replevin at the Long Branch Apartment in August 2001. Otis told the officer that Defendant no longer lived there. (Rothstein S.J. Aff. Ex. 37.)

Still relying on the January 4, 2001 alleged service,
Plaintiff obtained a judgment of replevin in New Jersey state
court on March 1, 2002. (Id. Ex. 36.)  Plaintiff did not pursue
her damages claims because she could not find Defendant, and the
court administratively dismissed the case. (Pl. S.J. Br. at 4.)
Defendant contends that he learned of the action against him at
some point "between 2003 and 2005," but that when he inquired
about it at the New Jersey courthouse, a clerk told him that the
case had been dismissed. (Def. Br. at 7.)

Plaintiff's counsel finally reached Defendant by telephone
in 2007, and they had several discussions about settling the
dispute. (Pl. Aff. ¶ 18.)  Those discussions bore no fruit.  In
2010, Plaintiff revived her New Jersey judgment against
Defendant and reasserted her damages claims.  In a letter to the
New Jersey court, Defendant requested that the case be
transferred to New York, where he has lived in a Manhattan
apartment since June 2001. (Rothstein S.J. Aff. Ex. 46.)
Plaintiff consented, the instant action was opened, and
Defendant retained pro bono counsel.

## B.   The Parties' Cross-Motions

In her Rule 56 motion, Plaintiff argued that she is
entitled to summary judgment "on her right to posses [sic] the
impounded photographs and negatives" by virtue of the 2002 New

Jersey judgment. (Pl. Br. at 5.)  Defendant cross-moved for a declaration that the New Jersey judgment is unenforceable.  He asserted that he was never properly served in New Jersey because he did not live at the Long Branch Apartment when service was attempted.

After determining that the principal question was Defendant's residence on or around January 4, 2001, this Court concluded that the evidence before it was unclear on that question.  An evidentiary hearing was scheduled "to determine Defendant's residential status as of January 2001, whether he was on notice of the litigation prior to the entry of default judgment, and any other facts that are relevant to the limited jurisdictional question." Khaldei, 2013 WL 6331794, at *6.

## C.   The Evidentiary Hearing

The evidentiary hearing took place over three days, on January 29, 31, and February 25, 2014.  Defendant was the only person to testify at the hearing.

At first, Defendant testified that he never lived with Otis in Long Branch. (Tr. at 13–14.)  He maintained that he instead lived with his sister in Brooklyn from about 1994 until May 31, 2001, at which time he moved to an apartment in Manhattan. (Id. at 10–11.)  Defendant stated that he did stay or visit with Otis at various times during their relationship, but ceased doing so

5

upon their breakup in 1999. (Id. at 13.)  His testimony
regarding the timing of their breakup was imprecise. (Id.
("about autumn-time"); id. at 39 ("August/September"); see Pl.
Ex. 4 ¶ 55 ("approximately July 1999").)  And, at times,
Defendant indicated that he did indeed live with Otis for an
extended period. (Tr. at 106-08.)  However, he has never
admitted to living with her in or around the relevant period in
January 2001.

     The documentary evidence in this case, much of which was
discussed at the hearing, provides some clues regarding
Defendant's whereabouts.  The evidence includes:

- Defendant's amended 1997 tax return, filed in 2004,
  which lists his home address at his sister's Brooklyn
  residence. (Pl. Ex. 24.)

- Wire transfers sent by Defendant to Irina Balakina, the
  mother of Evgeny's son Efim. (Pl. Ex. 11, 17.)  On
  these money orders, he listed his address as the Long
  Branch Apartment.  At the hearing, Defendant testified
  that he used this address not because he lived there,
  but because he wanted to conceal the fact of his
  breakup with Otis from Balakina. (Tr. at 49-50; accord
  Pl. Ex. 4 ¶ 58.)  He further testified that he sent
  these wire transfers from a Western Union in Long

Branch because he periodically stayed with his son at a
house in Sea Bright, New Jersey. (Tr. at 49-50.)

- Defendant's current driver's license, which lists his
Manhattan address. (Def. Ex. A.)  This license was
issued on October 4, 2001, after the relevant time
period.  Defendant testified that his prior license
listed his sister's Brooklyn address. (Tr. at 152.)

- Otis's sworn declaration, and her earlier letter to the
clerk of court in New Jersey, discussed previously.
(Otis Dec. & Ex. 1.)

- Royalty statements from an entity known as Corbis.
Evgeny and Defendant had previously entered into a
licensing agreement with Corbis, whereby they supplied
Evgeny's negatives to Corbis for scanning and licensing
to third parties in exchange for royalties. (Rothstein
S.J. Aff. Ex. 3.)  The Corbis royalty statements in the
summary judgment record were ostensibly sent to
Defendant at various times from 1998 to 2000.
(Rothstein S.J. Aff. Ex. 6, 11-12, 14-15, 19-20, 22.)
Plaintiff's counsel introduced four of these royalty
statements into evidence at the hearing:  October 1999,
January 2000, April 2000, and July 2000. (Pl. Ex. 4.)
Defendant acknowledged receiving the first royalty

statement in October 1999, but not the three from 2000.
(Tr. at 33-36.)  He produced all four of them in this
litigation, although defense counsel speculated that he
may have received copies of them belatedly from Corbis.
(Id. at 37; accord id. at 141 ("[L]ater, they send me,
like, three or four statements at once to Brooklyn.").)

There was very little testimony at the hearing regarding
the other question explicitly posed by the Court in its earlier
ruling, "whether [Defendant] was on notice of the litigation
prior to the entry of default judgment." Khaldei, 2013 WL
6331794, at *6; see Tr. at 8; 53.  Plaintiff's counsel
repeatedly asked Defendant if Otis gave him any court documents
after they reconciled. (Id. at 110-113.)  He testified that she
did not give him any papers, and that their reconciliation did
not occur until 2003, well after the judgment of replevin was
entered in New Jersey. (Id.)  Additionally, while there was
extensive discussion of unrelated litigation against Defendant
by other parties, no evidence was introduced to suggest that
Defendant knew of the pendency of the New Jersey replevin action
before judgment was entered in that action on March 1, 2002.

After the evidentiary hearing, the parties filed
simultaneous supplemental briefs.  Upon being served with
Plaintiff's brief, defense counsel objected to that brief's

8

references to certain exhibits not admitted into evidence at the hearing.  The Court will resolve those objections before proceeding to the jurisdictional question.

## II.  The Dispute over the Admitted Evidence

At the outset, it is necessary to resolve the parties' dispute over precisely which exhibits should be considered by the Court in ruling on the instant matter.  By letter dated March 27, 2014, Defendant asks the Court to strike or disregard Plaintiffs' Exhibits 5, 15–16, 19–21, 23, 27, and 41–45 on the grounds that these exhibits were not admitted into evidence at the evidentiary hearing or part of the summary judgment record already before the Court.

At the hearing, this Court was quite clear that any documents that the parties intended to rely upon in their post-hearing submissions must either be admitted at the hearing or be part of the summary judgment record.  As the Court noted,

> THE COURT:  . . . A posthearing submission only covers what took place at the hearing.  You could summarize the facts at the hearing.  You could make arguments as to what took place at the hearing, and you can cite law that you think applies to what took place at the hearing, but you can't put new documents in. . .  I'm not going to take submissions that contain new documents that were not in evidence at the hearing.  That's all I'm trying to say.

> MR. ROTHSTEIN:  Yes, I understand.  Thank you.

> THE COURT:  Thank you.

(Tr. at 116.)

The Court will not now reverse course on these ground rules, which were understood and agreed to by all.[1]  Accordingly, documents submitted as exhibits to the parties' summary judgment briefing will be considered, as will exhibits received into evidence at the hearing.  Plaintiffs' Exhibits 19-21, 23, 27, and 41-45 were neither submitted on summary judgment nor admitted into evidence at the hearing, and so the Court will not consider them.  The record reflects some ambiguity about whether Exhibits 5 and 15 were admitted at the hearing; the Court will consider these.  It will also consider Exhibit 16, a March 15, 2011 letter from Plaintiff's counsel to the Court, to the extent it is relevant.  Exhibit 16 was not admitted at the hearing but is part of the case file. Cf. Hearing Tr. at 116 ("I'm not going to take submissions that contain new documents that were not in evidence at the hearing." (emphasis added).)

---

[1] Counsel's repeated protest that documents should be belatedly admitted into evidence because he was "limited by time" at the hearing borders on the absurd. (ECF No. 143 at 2; see id. at 10-12.)  Counsel had more than four hours over three days to introduce evidence at the hearing.

### III. Plaintiff Has Not Demonstrated that Service of Process Was Validly Effected

#### A.    Relevant Legal Standards

As this Court discussed in its December 5, 2013 Opinion, a default judgment is void and cannot be enforced if the rendering court did not have personal jurisdiction over the defendant. See, e.g., City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 138–39 (2d Cir. 2011).  In the instant case, then, the New Jersey judgment against Defendant is enforceable only if the rendering New Jersey court had personal jurisdiction over him – that is, only if he was properly served. See Sartor v. Toussaint, 70 F. App'x 11, 13 (2d Cir. 2002) (summary order) ("A judgment is void for lack of personal jurisdiction over the defendant where service of process was not properly effected.") (citations omitted).  "Although there is no judicial discretion when considering a jurisdictional question such as the sufficiency of process, when confronted with equally reliable but conflicting accounts, courts should resolve any doubts in favor of the party seeking relief." Am. Inst. of Certified Pub. Accountants v. Affinity Card, 8 F. Supp. 2d 372, 375 (S.D.N.Y. 1998).

Despite arguing that the New Jersey judgment is void for lack of personal jurisdiction, Defendant has made his motion under Rule 56 rather than Rule 60.  His reason for this is

11

unclear.  Rule 60(b)(4) provides, in relevant part:  "On motion
and just terms, the court may relieve a party . . . from a final
judgment . . . [if] the judgment is void." Fed. R. Civ. P.
60(b)(4); see, e.g., Local 78, Asbestos, Lead & Hazardous Waste
Laborers v. Termon Constr., Inc., No. 01 Civ. 5589, 2003 WL
22052872, at *3 (S.D.N.Y. Sept. 2, 2003) ("[A] default judgment
entered against the defendant by means of improper service is
void under Rule 60(b)(4).").  Regardless of whether the New
Jersey judgment is a "default" judgment, as both parties refer
to it, it is unquestionably "final" as required by Rule
60(b)(4).  The rule applies even where the court hearing the
motion is not the same court that entered the default judgment.
See, e.g., MWH Int'l, Inc. v. Inversora Murten S.A., No. 11 Civ.
2444, 2012 WL 3155063, at *7–8 (S.D.N.Y. Aug. 3, 2012)
(concerning a judgment from the District of New Jersey); Avelar
v. J. Cotoia Constr., Inc., No. 11 Civ. 2172, 2011 WL 5245206,
at *2 (E.D.N.Y. Nov. 2, 2011) (rendering void a state court
default judgment).  Accordingly, the Court construes Defendant's
motion as arising under Rule 60(b)(4). See Arista Records, Inc.
v. Musemeci, No. 03 Civ. 4465, 2007 WL 3124545, at *2 (E.D.N.Y.
Sept. 18, 2007), report and recommendation adopted, 2007 WL
3145861 (E.D.N.Y. Oct. 25, 2007) (construing defendant's motion
as arising under Rule 60(b)(4) because he alleged that he was

12

never served with a summons or complaint); see also Trustees of
Local 531 Pension Fund v. Am. Indus. Gases, Inc., 708 F. Supp.
2d 272, 274-75 (E.D.N.Y. 2010).

This is potentially significant because the Second Circuit
has held that the burden of proof on a defendant's Rule 60(b)(4)
motion depends upon the circumstances of the case.  Ordinarily,
a plaintiff bears the burden of demonstrating that service of
process was validly effected. MWH Int'l, 2012 WL 3155063, at *8
(quoting Triad Energy Corp. v. McNell, 110 F.R.D. 382, 385
(S.D.N.Y. 1986)); Arista Records, 2007 WL 3124545, at *2;
Nature's First Inc. v. Nature's First Law, Inc., 436 F. Supp. 2d
368, 373 (D. Conn. 2006); cf. "R" Best Produce, Inc. v. DiSapio,
540 F.3d 115, 126 (2d Cir. 2008).  However, "on a motion to
vacate a default judgment based on improper service of process
where the defaulting defendant had actual notice of the original
proceeding but delayed in bringing the motion, the defendant
bears the burden of proof to establish that the purported
service did not occur." Burda Media, Inc. v. Viertel, 417 F.3d
292, 299 (2d Cir. 2005).  Although that phrasing is somewhat
ambiguous, both the cases cited by Burda and those that cite to
it clarify that the burden of proof only shifts where the
defendant was on notice of the original proceeding before the
entry of default judgment. See id. (citing Bally Export Corp. v.

13

Balicar, Ltd., 804 F.2d 398, 401 (7th Cir. 1986) ("If the
defendant, after receiving notice, chooses to let the case go to
a default judgment, the defendant must then shoulder the burden
of proof when the defendant decides to contest jurisdiction in a
postjudgment rule 60(b)(4) motion."); Miller v. Jones, 779
F. Supp. 207, 210 (D. Conn. 1991); Rohm & Haas Co. v. Aries, 103
F.R.D. 541, 543–44 (S.D.N.Y. 1984) ("[I]t is not unfair to place
the burden on a defendant who has chosen to contest jurisdiction
after judgment under Rule 60(b) rather than at the time of trial
pursuant to Rule 12.")); accord SEC v. Internet Solutions for
Bus., Inc., 509 F.3d 1161, 1163 (9th Cir. 2007) ("We join our
sister circuits in holding that a defendant moving to vacate a
default judgment based on improper service of process, where the
defendant had actual notice of the original proceeding but
delayed in bringing the motion until after entry of default
judgment, bears the burden of proving that service did not
occur." (citing Burda, 417 F.3d at 299) (emphasis added); id. at
1166 n.6 ("Whether or not Shaw had notice of the default
judgment is irrelevant.  Under the rule we have adopted, we look
at whether the defaulting defendant had notice that suit had
been filed." (emphasis in original)). But see GMA Accessories,
Inc. v. BOP, LLC, No. 07 Civ. 3219, 2008 WL 762782, at *1–*2 &

n.2 (S.D.N.Y. Mar. 20, 2008) (focusing on whether defendant
delayed after entry of default).

Turning to the substantive question, the parties previously
agreed that the Court should look to New Jersey law to determine
whether service was proper.  Plaintiff specifically relies on
New Jersey Court Rule 4:4-4(a)(1), which confers personal
jurisdiction where service is made by leaving a copy of the
summons and complaint "at the individual's dwelling place or
usual place of abode with a competent member of the household."
The parties also agree that the rule has been interpreted to
refer to where the individual is actually living on the date
service is attempted. (Def. S.J. Br. at 11; Oral Arg. Tr. at 3.)
See also Fid. & Deposit Co. of Md. v. Abagnale, 234 A.2d 511,
519 (N.J. Super. Ct. Law Div. 1967) (collecting cases).  This
includes "person's permanent home, even if he or she is
temporarily staying elsewhere," but does not extend to "a house
from which defendant is absent for an extended and continuous
period of time." Bank of New York for the Benefit of the Asset
Backed Certificates Series 2007-2 v. Tross, 2011 WL 1584426, at
*4 (N.J. Super. Ct. App. Div. Apr. 28, 2011) (unpublished
opinion) (citations and internal quotation marks omitted).

The record is unclear as to whether process was served on
Otis personally, or whether the server instead taped the papers

15

to the front door. <u>Compare</u> Rothstein S.J. Aff. Ex. 27, <u>with</u> Otis
Dec. ¶ 11.  "Rule 4:4-4(a)(1) requires hand delivery to a
person, not merely to a place." <u>Slater v. Hardin</u>, No. L-8574-09,
2014 WL 923337, at *3 (N.J. Super. Ct. App. Div. Mar. 11, 2014).
However, this requirement will not destroy otherwise-valid
service where the serving party has substantially complied with
the rule in a way that affords reasonable notice to the
defendant. <u>See</u> <u>id.</u> at *3-4; <u>see also</u> <u>Sobel v. Long Island Entm't</u>
<u>Prods., Inc.</u>, 747 A.2d 796, 800-01 (N.J. Super. Ct. App. Div.
2000).  Defendant notes the discrepancy, but does not challenge
the service on this basis. (Def. Br. at 4 n.5.)  He maintains
only that service was invalid because Defendant did not live
there. (Def. S.J. Br. at 11-13).  Accordingly, even if the
papers were taped to the door as Otis contends, Defendant will
be bound by the judgment if the Court determines that he
actually lived there on or around January 4, 2001.

### B.   Plaintiff Bears the Burden of Proving Valid Service of Process

At the outset, the Court notes that under the circumstances
of this case, the Second Circuit's test for whose burden it is
to prove or disprove valid service of process is a circular one.
As explained above, the burden is ordinarily Plaintiff's, but
can shift to Defendant upon a showing that he knew about the
underlying New Jersey litigation before judgment was entered.

16

The problem is that here, the question of service overlaps entirely with the question of notice.  If Defendant lived at the Long Branch Apartment, it follows that the service of process to that address put him on notice of the litigation — in which case he bears the burden of proving that he did <u>not</u> live there. Similarly, if he did not live at the Long Branch Apartment in January 2001, and was not otherwise on notice of the New Jersey litigation, then it is the Plaintiff's job to prove that Defendant <u>did</u> live there.  Needless to say, this paradox adds little value to the analysis.

Nevertheless, the Court concludes that Defendant did not know about the New Jersey litigation before the final judgment of replevin was entered.  Importantly, the Court observes that in most cases where courts have shifted the burden to the defendant to disprove service, including <u>Burda</u>, it was conceded or uncontroverted that defendant had knowledge of the underlying suit before the entry of judgment. See <u>Burda</u>, 417 F.3d at 299; <u>see also, e.g.</u>, <u>De Curtis v. Ferrandina</u>, 529 F. App'x 85, 86 (2d Cir. 2013) (summary order); <u>Concord Capital Mgmt, LLC v. Brecka</u>, No. 11 Civ. 5545, 2013 WL 706170, at *1–3 (S.D.N.Y. Feb. 27, 2013); <u>Kulwa v. Obiakor OB/GYN P.C.</u>, No. 12 Civ. 1868, 2013 WL 504383, at *1 (E.D.N.Y. Feb. 8, 2013); <u>77 Charters, Inc. v. SYC Realty LLC</u>, No. 10 Civ. 1681, 2012 WL 1077706, at *3 (E.D.N.Y.

Feb. 27, 2012), report and recommendation adopted, 2012 WL
1078466 (E.D.N.Y. Mar. 30, 2012); Orix Fin. Servs., Inc. v.
Thunder Ridge Energy, Inc., 579 F. Supp. 2d 498, 505 (S.D.N.Y.
2008), aff'd in part and vacated in part on other grounds, 369
F. App'x 174 (2d Cir. 2010); Miller, 779 F. Supp. at 210.
Moreover, no evidence adduced at the evidentiary hearing leads
the Court to conclude that Defendant had actual notice of the
case in 2001 or 2002.  Accordingly, it is Plaintiff's burden to
prove that the January 4, 2001 attempted service was valid.

### C.   Plaintiff Has Not Met Her Burden

The Court has little difficulty concluding that Defendant
lived with Otis for at least some period before 2000.  Defendant
appeared to acknowledge this point at the evidentiary hearing.
(Tr. at 106-08.)  More important, Otis's letter to the New
Jersey court clerk states that "Kalman Kaspiev, who is named in
the papers, no longer lives at this address." (Otis Dec. Ex. 1.)
(emphasis added); see also Rothstein S.J. Aff. Ex. 37 (Otis
reportedly telling a deputy sheriff that "they no longer live
together").  Thus, although the defense position is that Kaspiev
only "stayed" with Otis, this characterization is
inconsequential as a legal matter.  Labels aside, service of
process at the Long Branch Apartment was proper if Defendant
actually lived there on or around January 4, 2001.

18

This is a closer question.  As the Court noted previously,
much of the documentary evidence on this question is of limited
relevance because it precedes the crucial time period.  See
Khaldei, 2013 WL 6331794, at *5.  On one hand, there is evidence
suggesting that Defendant did not live in the Long Branch
Apartment on or around January 4, 2001, including Defendant's
own testimony.  At the hearing, Defendant was adamant that he
and Otis had broken up and were not speaking regularly in early
2001.  As a general matter, the Court found Defendant's
testimony to be lacking in credibility, and there is good reason
to view his self-serving statements on the jurisdictional
question with skepticism.

But the record also includes documentary evidence from Otis
— both her 2001 letter to the New Jersey court and her sworn
affidavit in this case. (Otis Dec. & Ex. 1.)  In both documents,
Otis states unequivocally that Defendant did not live with her
during the relevant period.  Thus, this Court cannot conclude
that Plaintiff was living there without rejecting Otis's
statements as false.  There is no real basis for the Court to
discard Otis's representations, however, because Plaintiff did
not call Otis at the hearing to solicit her testimony or impeach
her credibility.  True, she has apparently reconciled with
Defendant, which could conceivably give her an incentive to

perjure herself to his benefit in her affidavit.  But there was
no obvious reason for her to lie to the New Jersey state court
in January 2001, unless her purported breakup with Defendant is
itself a lie.  Plaintiff's submission implies that Kaspiev and
Otis may well have perpetrated such an elaborate, long-running
con. (Pl. Br. at 10–12.)  No compelling evidence exists to
support this theory, however.  In the absence of such evidence —
and of Otis herself — the Court credits her submissions.

Plaintiff looks to other evidence to support her contention
that Defendant still lived with Otis in January 2001.  The
documents that initially appear most damning are two wire
transfer receipts, one from February 2000 and another from
February 2001. (Pl. Ex. 11, 17.)  On these receipts, Defendant
listed his address as the Long Branch Apartment.  Defendant
testified that he did so not because he actually lived there,
but rather because he wanted to conceal the fact of his breakup
with Otis from Balakina, the recipient of the money. (Tr. at 49–
50; accord Pl. Ex. 4 ¶ 58.)  This is a dubious explanation,
substantially for the reasons set forth in Plaintiff's post-
hearing brief, and the Court would be inclined to discredit it
but for one reason:  Defendant continued to list the Long Branch
Apartment address on wire transfers to Balakina in 2003 and
2005, long after his June 2001 move to Manhattan. (Rothstein

Aff. Ex. 37, 39.)  There is no serious dispute, and the Court makes the finding, that Defendant has lived in Manhattan since June 2001.[2]  Since Defendant continued to list the Long Branch Apartment address on the Western Union transactions well after moving to Manhattan, the Court is left to conclude that whatever his reasons for doing so, they have little to do with his actual residence.[3]

Plaintiff also points to the fact that Defendant produced royalty statements from Corbis dated October 1999, January 2000, April 2000, and July 2000.  Defendant testified that he may have received the October 1999 statement in Long Branch, but the record is unclear about when Defendant first received the 2000 statements from Corbis. (Tr. at 35–37.)  Plaintiff speculates that Defendant received them when they were sent, either because he still lived with Otis or because she forwarded them to him. Defendant testified that he did not get them in 2000 (Tr. at

_____

[2] There is abundant evidence in the record for this finding. See Def. Ex. A (driver's license); Def. Ex. B (lease); Pl. Ex. 35; Rothstein S.J. Aff. Ex. 37; Tr. at 62–63; see also Pl. Br. at 2 (Plaintiff acknowledging that Defendant moved to his Manhattan apartment "in June 2001").

[3] Indeed, Plaintiff makes a similar point in her brief:  "In light of Kaspiev's pattern of stating one address while claiming to live in another, his use of the Brooklyn address on several documents does not show that he ever lived there." (Pl. Br. at 16.)  This point applies with equal force to Defendant's sporadic use of the Long Branch Apartment address after 1999.

35), which is consistent with a letter he wrote to Corbis dated March 19, 2010, which states:  "Corbis sent me royalty statements from 1998-1999.  Since 1999 however, Corbis inexplicably stopped sending me these royalty statements.  I am requesting that Corbis now send me royalty statements from the year 2000 to the present date." (Pl. Ex. 38.)  The defense brief asserts that the 2000 statements produced in discovery were forwarded by Corbis to Defendant in response to this letter. (Def. Br. at 10.)  Adding to the confusion is the fact that Plaintiff's former counsel sent a letter to Corbis on May 1, 2000, requesting that Corbis direct all correspondence to him rather than to Defendant.  Corbis agreed to comply with this request. (Pl. Ex. 30.)  This makes it very unlikely that Defendant actually received the July 2000 statement in July 2000, since that statement would have been directed instead to Plaintiff's counsel.  Bearing in mind that service was not attempted until January 2001, the Court concludes that the remaining two statements in dispute (January 2000 and April 2000) offer no real probative value.

Plaintiff's post-hearing submission also sets forth, at great length, purported inconsistencies in Defendant's testimony and other statements.  The Court agrees with Plaintiff that Defendant was evasive and occasionally mendacious on the stand.

22

However, this does not suffice to carry Plaintiff's burden. Even if the Court found that Defendant lied consistently throughout the course of his testimony, it does not necessarily follow that Defendant lived at the Long Branch Apartment on or around January 4, 2001.  The documentary record is ambiguous at best, and Otis's unimpeached affidavit supports the defense position.

Frankly, the Court is no closer to knowing Defendant's true whereabouts on January 4, 2001 than it was a year ago.  But as discussed, the burden is not on Defendant; it is Plaintiff's job to demonstrate that service was valid.  In view of the ambiguous record in this case, the Court must conclude that Plaintiff has failed to show that Defendant lived with Otis at the Long Branch Apartment in January 2001. See Nature's First, 436 F. Supp. 2d at 374; Affinity Card, 8 F. Supp. 2d at 375.

### IV.   Plaintiff's Alternative Arguments Do Not Compel Enforcement of the New Jersey Default Judgment

In her initial summary judgment brief, Plaintiff argued that Defendant could be bound by the New Jersey judgment on a theory of "constructive notice." See Pl. S.J. Br. at 9; see also Rothstein Letter of Dec. 19, 2013 at 1–2.  This Court rejected Plaintiff's argument in its earlier rulings. See 2014 WL 114350, at *1–2; 2013 WL 6331794, at *6.

Now, in her post-hearing submission, Plaintiff offers a novel theory of enforceability.  She contends that the New Jersey judgment should be enforced because Defendant did business as "Abcot," a trade name registered with the Monmouth County Clerk's Office.  That registration lists the Long Branch Apartment as Defendant's address, making it a suitable address for service of Abcot.  From there, Plaintiff posits that Otis must be considered a suitable agent for service of process.  But because Plaintiff sued Defendant in his individual capacity (both here and in New Jersey state court), and because the New Jersey judgment has nothing to do with Abcot, the issues Plaintiff now raises are irrelevant.  Her argument is rejected.

### V.   Conclusion

For the foregoing reasons, the New Jersey writ and judgment of replevin cannot be enforced because Plaintiff has failed to demonstrate that service of process was validly effected. Accordingly, summary judgment on Count One of the complaint is entered in favor of Defendant.  A conference will be held on Tuesday, June 24, 2014 at 11:00 A.M. in Courtroom 20-C to discuss each party's remaining claims, the status of expert discovery, and the appropriate course of action moving forward.

**SO ORDERED.**

Dated:     New York, New York
           June 9, 2014

                                    _____
                                        John F. Keenan
                                    United States District Judge