USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Sept. 28, 2015

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------X

ANNA EFIMOVNA KHALDEI,             :
                                  :
                Plaintiff,         :
                                  :        No. 10 Civ. 8328 (JFK)
     -against-                     :
                                  :        **OPINION & ORDER**
KALMAN KASPIEV,                    :
                                  :
                Defendant.         :

------------------------------X

APPEARANCES

FOR PLAINTIFF ANNA EFIMOVNA KHALDEI:
     Daniel J. Rothstein

FOR DEFENDANT KALMAN KASPIEV:
     Margaret A. Dale
     John M. Browning
     PROSKAUER ROSE LLP

**JOHN F. KEENAN, United States District Judge:**

This case involves a long-standing dispute over the possession of World War II photographs and negatives taken by Plaintiff Anna Efimovna Khaldei's father, Evgeny Khaldei. Plaintiff now moves for summary judgment on her claims. She seeks (1) permission to take possession of the photographic prints and negatives currently deposited with the Court, (2) dismissal of Defendant Kalman Kaspiev's counterclaim for royalties, and (3) an award of monetary damages and injunctive relief.  For the reasons discussed below, Plaintiff's motion is denied in part and granted in part.

## I.   Background

### A.   Facts and Procedural History

The following facts are taken from the record following discovery.  Plaintiff, a resident of Russia, is the daughter and heir of the late World War II Russian photographer Evgeny Khaldei (hereinafter, "Khaldei").  Defendant is a professional photojournalist living in New York.  This action arises out of Defendant's activities as agent for Khaldei and his estate.

Defendant's professional relationship with Khaldei began informally.  From 1990 until early 1997, Defendant claims that he acted "unofficially" as Khaldei's agent, with the goal of promoting Khaldei's work and establishing a market price for sales in the United States. (Dep. of Kalman Kaspiev, dated Dec. 11-12, 2014 ("Def.'s Dep.") 11:19-25, 16:2-5.)  For instance, in 1996, Defendant negotiated the sale of ten of Khaldei's photographs to the Library of Congress for $6,000. (Id. 16:14-17:3.)  According to Defendant, Khaldei insisted on sharing the proceeds from this sale with Kaspiev, saying "you're my agent, 50/50." (Id. 17:16-20.)

Defendant's relationship with Khaldei was formalized on March 11, 1997, when they entered into an agreement (the "Agency Agreement") providing that Defendant would act as Khaldei's worldwide agent for twenty years for the "promotion and sale of photographs produced for sale from the negatives of Khaldei."

2

(ECF No. 80, Rothstein Reply Aff., dated Apr. 3, 2013, Ex. 1.)
Under this agreement, Defendant agreed to bear "[a]ll expenses
in the production and printing of photographs," as well as the
costs of "the promotion and advertising of Khaldei and his
work." (Id.)  The Agency Agreement also stated that Defendant
would be responsible for setting the price of any sales. (Id.)
In exchange, Defendant was to receive 50 percent of "all net
proceeds from the sale of the photo[graphs] produced and sold
after the date of this Agreement." (Id.)

The next day, Khaldei and Defendant entered into a separate
agreement (the "License Agreement") with Corbis Corporation
("Corbis"), a digital archive that licenses images to third
parties.  This agreement called for Khaldei, Kaspiev, and Corbis
to select images for licensing and for Khaldei to deliver
negatives for these images to Corbis along with caption
information "related to each selected image upon delivery." (ECF
No. 66, Rothstein Aff., dated Feb. 26, 2013 ("Rothstein 2013
Aff."), Ex. 3 ¶ 6.)  The License Agreement also provided that
Defendant, as Khaldei's agent, would "translate all caption
information into English." (Id.)  In return, Corbis promised to
pay Khaldei a pro rata share of any royalties, beginning with an
advance of $25,000, which was paid in two installments of $5,000
and $20,000, respectively. (Id. ¶¶ 2-3.)  The parties agree
that, pursuant to the Agency Agreement, Defendant received fifty

3

percent of the Corbis Advance. (Pl.'s Mem. at 3; ECF No. 71, Decl. of Kalman Kaspiev, dated Mar. 19, 2013 ("Def.'s 2013 Decl."), ¶¶ 25-26, 34.)  The 1997 License Agreement was entered into for a period of twenty years. (ECF No. 66, Rothstein 2013 Aff. Ex. 3 ¶ 1.)

Khaldei died on October 6, 1997.  On October 13, 1997 Plaintiff and her brother, Leonid Khaldei, as Khaldei's heirs, signed a new agency agreement with Defendant (hereinafter, the "Renewal Agreement"). (Def.'s Dep. 59:12-15; 169:11-20.)  This agreement identified Plaintiff and her brother as the "sole heirs" of "all [Khaldei's] creative legacy and property" (hereinafter, the "Khaldei Estate"). (ECF No. 71, Def.'s 2013 Decl. Ex 6.)  The Renewal Agreement also provided that all of Khaldei's contracts made with Defendant remained in force and designated Kaspiev the "world representative agent for the creative legacy of 'Yevgeniy Khaldey.'"[1] (Id.)

Shortly thereafter, Defendant instructed Corbis to return the negatives selected and scanned under the License Agreement (hereinafter, the "Corbis Negatives") to him, rather than to Khaldei's heirs. (ECF No. 66, Rothstein 2013 Aff. Ex. 5.) According to Defendant, he later contacted Corbis to express his concern that some images on the Corbis website did not match the

---

[1] The names "Yevgeniy Khaldey" and "Evgeny Khaldei" refer to the same individual and reflect only differences in translation.

negatives in his possession and, in response, he received a letter from Corbis in September 1998 stating that it had no "outstanding Khaldei images to return." (ECF No. 216, Decl. of Margaret A. Dale, dated February 18, 2015 ("Dale 2015 Decl."), Ex. 10; see also ECF No. 71, Def.'s 2013 Decl. ¶ 46.)

In December 1997, Plaintiff met with Defendant in New York and provided him with 261 photographic prints for Kaspiev to sell (the "Disputed Prints"),[2] together with 55 additional negatives to be sent to Corbis.[3] (ECF No. 61, Pl.'s Aff., dated Feb. 19, 2013 ("Pl.'s 2013 Aff.") ¶¶ 9-10.)  Defendant, for his part, contends that he paid Plaintiff $7,500 in return for "an undivided half ownership interest" in these prints. (ECF No. 215, Def.'s Response to Rule 56.1 Statement No. 18.)  While Plaintiff denies having received any money from Kaspiev relating

---

[2] Previously, Defendant claimed that he only received 248 photographic prints from Plaintiff in December 1997.  Following discovery, however, the parties apparently agree that 261 prints were delivered.  According to Defendant, these included 248 that were signed by Khaldei, as well as 13 that were not signed. (Def.'s Dep. 115:17-24; see also ECF No. 216, Dale 2015 Decl. Ex. 8.)

[3] Although Plaintiff contends that Kaspiev has failed to account for the 55 additional negatives allegedly given to him by Plaintiff in December 1997, these negatives are not raised in Plaintiff's request for damages in the instant motion.  Instead, as discussed below, Plaintiff seeks damages only for "855 of the negatives that Corbis selected and scanned under the License Agreement," which Plaintiff claims are missing. (See Pl.'s Mem. at 5, 22 (distinguishing between the "855 . . . negatives that Corbis selected and scanned under the License Agreement" and "the 55 duplicate negatives" that Defendant received from Plaintiff, and calculating damages based only on the former).)

to the Disputed Prints, the parties agree that he was entitled to half of any revenue earned from his sale of the Disputed Prints. (Pl.'s Mem. at 7; Def.'s Mem. at 2-3.)  Although it appears that none of the Disputed Prints were ever sold, Defendant claims that he gave four of the Disputed Prints to an attorney, Gary Schonwald, sometime between 1998 and 2002 in return for performing pro bono services related to the Khaldei Estate. (See Def.'s Dep. 64:16-17; see also ECF No. 97, Rothstein Aff., dated June 6, 2013, Ex. 23.)

The parties' relationship subsequently broke down.  In June 1999, Plaintiff met with Defendant in New York in order to secure the return of the Disputed Prints, as well as any negatives taken by Khaldei in Defendant's possession. (Pl. Mem. at 4.)  The parties' accounts of this meeting differ sharply, with Plaintiff asserting that she did not receive any materials from Kaspiev (Dep. of Anna Efimovna Khaldei, dated Dec. 8, 2014 and Dec. 10, 2014 ("Pl.'s Dep.") 237:21-238:7), while Defendant contends that he returned approximately 135 of the 261 Disputed Prints to Plaintiff. (Def.'s Dep. 116:3-12.)  During this meeting, Plaintiff also told Defendant that she had decided not to pursue a sale of Khaldei's prints and negatives to the Library of Congress. (Id. 128:19-129:2.)

In or around December 2000, Plaintiff initiated a lawsuit against Defendant in New Jersey state court for replevin and

damages. (See ECF No. 66, Rothstein 2013 Aff. Ex. 26; see also
ECF No. 61, Pl.'s 2013 Aff. Ex. 6 (certificate noting
Plaintiff's right to inherit half of the Khadlei Estate); id.
Ex. 7 (document granting Plaintiff power of attorney over Leonid
Khaldei's interest in the Khaldei Estate).)  Although Plaintiff
repeatedly attempted to serve Defendant in connection with this
action at an address in New Jersey, these attempts were
unsuccessful. (Pl.'s Mem. at 4; ECF No. 66, Rothstein 2013 Aff.
Ex. 27-28.)  Defendant subsequently failed to appear in the New
Jersey action.  As a result, the New Jersey court issued a
default judgment of replevin and administratively dismissed the
case in 2002. (ECF No. 66, Rothstein 2013 Aff. Ex. 36.)

Kaspiev states that he learned of the New Jersey action in
2003, at which time he went to the courthouse and reviewed
documents from the case file. (Def.'s Dep. 87:6-89:2.)  Among
other exhibits, this file included a letter notifying Kaspiev
that Plaintiff was terminating his agency and that he was not
authorized to act on behalf of Khaldei's heirs, as well as a
supporting affidavit submitted by Plaintiff and co-signed by
Leonid Khaldei. (Pl. Mem. at 23; ECF No. 61, Pl.'s 2013 Aff.
¶ 16; id. Ex. 7-8.)  Despite learning of this lawsuit, however,
Kaspiev admits that he had no direct communication with
Plaintiff until 2007, when Plaintiff reached Defendant by
telephone. (ECF No. 61, Pl.'s 2013 Aff. ¶ 18.)  The parties

7

thereafter had several discussions about settling the dispute, but failed to reach an agreement.  As a result, Plaintiff commenced this action in November 2010.

### B.    The Present Action

In March 2011, Defendant was ordered to deposit with the Court all photographs and negatives taken by Khaldei in Defendant's possession, custody, or control. (ECF No. 18, Order dated Mar. 29, 2011.)  Defendant subsequently deposited 266 photographic prints and 3,031 negatives. (ECF No. 215, Def.'s Response to Rule 56.1 Statement Nos. 33-34.)  Defendant contends that more than half of the 266 impounded prints come from his private collection of Khaldei's work. (See Def.'s Dep. 64:16-17, 116: 3-12.)

In March 2013, the parties filed cross-motions for partial summary judgment, which were denied in part and stayed in part pending an evidentiary hearing on the enforceability of the New Jersey default judgment.  (ECF No. 123, Op. & Order dated Dec. 5, 2013.)  Subsequently, in June 2014, the Court concluded that Plaintiff had failed to prove that service of the New Jersey replevin action was valid and granted summary judgment on that issue in Defendant's favor. (ECF No. 144, Op. & Order dated June 9, 2014.)  Plaintiff then moved for reconsideration of the June 2014 order, which was denied. (ECF No. 160, Mem. Op. & Order dated Aug. 12, 2014.)

Following the completion of discovery, Plaintiff filed the present motion for summary judgment.  This motion was fully briefed on March 4, 2015 and oral argument was held on April 1, 2015.

## II.  Discussion

### A. Legal Standard

Summary judgment is warranted when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).  The party seeking summary judgment bears the burden of demonstrating the absence of any genuine factual dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  However, where the nonmoving party will bear the burden of proof at trial, summary judgment is warranted if the nonmovant fails to "make a showing sufficient to establish the existence of an element essential to [its] case." Nebraska v.

Wyoming, 507 U.S. 584, 590 (1993); see also Arnold v. Geary, No.
09 Civ. 7299, 2012 WL 43623, at *3 (S.D.N.Y. Jan. 5, 2012).

### B.   Analysis

#### 1.   The Disputed Prints

##### i.   Ownership of the Disputed Prints

In moving for summary judgment on possession of the
Disputed Prints, Plaintiff asserts that Kaspiev's claim to be a
co-owner of these works is invalid as a matter of law.
Specifically, Plaintiff contends that these prints were
delivered to Kaspiev as a consignment and that Kaspiev
thereafter held them as trust property on Plaintiff's behalf.
(Pl.'s Mem. at 7-8.)   The Court agrees.

Under New York's Arts and Cultural Affairs Law ("ACAL"),
the delivery of work to an art merchant by an artist or his
estate "for the purpose of exhibition and/or sale on a
commission, fee or other basis of compensation" establishes a
consignor/consignee relationship.[4] N.Y. ARTS & CULT. AFF. LAW
§ 12.01(1); see also In re Friedman, 64 A.D.2d 70, 82-83 (N.Y.
App. Div. 1978) (finding that "consignments of art not sales are

---

[4] As both parties agree that New York law governs their
relationship, the Court will apply the substantive law of New
York State in addressing the present motion. See Krumme v.
WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) ("The
parties' briefs assume that New York law controls, and such
'implied consent ... is sufficient to establish choice of law.'"
(quoting Tehran-Berkeley Civil & Environmental Engineers v.
Tippetts Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d
Cir.1989)).

the prevalent business arrangement between artists, or their estates, and art dealers"). Thereafter, the art merchant holds the consigned work as trust property on behalf of the artist and his estate. See N.Y. ARTS & CULT. AFF. LAW § 12.01(1); see also id. § 11.01 ("'On consignment' means that no title to, estate in, or right to possession of, the work of fine art or multiple that is superior to that of the consignor vests in the consignee, notwithstanding the consignee's power or authority to transfer or convey all the right, title and interest of the consignor, in and to such work, to a third person."). Where an art merchant claims ownership of consigned work, the merchant bears the burden of establishing that full payment was made for that work to the artist or the artist's estate. See Grosz v. Serge Sabarsky, Inc., 24 A.D. 3d 264, 265 (Dec. 22, 2005).

Addressing the present motion, it is clear as an initial matter that Kaspiev falls under the scope of "art merchant" as defined by the ACAL. N.Y. ARTS & CULT. AFF. LAW § 11.01(2); see Wesselmann v. International Image Inc., 172 Misc. 2d 247, 250 (N.Y. Sup. Ct. 1996) (pointing to the defendants' prior statements that the plaintiff's "success was largely attributable to [their] skill and efforts" as evidence of defendants status as an art merchant), aff'd, 259 A.D.2d 448 (N.Y. App. Div. 1999), appeal dismissed, 94 N.Y.2d 796 (1999). Not only was Kaspiev the "world representative agent for the

creative legacy of 'Yevgeniy Khaldey'" at the time that he
received the Disputed Prints, but by his own account he was
responsible for establishing the market for Khaldei's work in
the United States and was tasked with selling the Disputed
Prints because of his superior knowledge of the art market,
stating:  "I'm the co-owner and an expert and an agent." (See
Def.'s Dep. 16:14-17:17:3, 166:7-8; ECF No. 71, Def.'s 2013
Decl. Ex. 6.)  Further, the parties agree that the purpose of
delivering the Disputed Prints to Kaspiev was to permit him sell
these prints to buyers in the United States. (See, e.g., Pl.'s
Dep. 92:4-7; Def.'s Dep. 49:6-19.)

     The final question, therefore, is whether Kaspeiv undertook
to sell the Disputed Prints on a basis of compensation.  The
parties agree that Kaspiev was responsible for selling the
Disputed Prints and that he was entitled to 50 percent of any
revenue earned from these sales. (See ECF No. 71, Def.'s 2013
Decl. ¶ 35; Pl.'s Mem. at 7.)  Defendant contends, however, that
his right to 50 percent of any sales revenue was not a basis of
compensation as understood under New York's Arts and Cultural
Affairs Law; rather, he claims that he purchased an ownership
interest in half of the Disputed Prints for $7,500 and was
therefore entitled as a co-owner—not an agent—to half of any
revenue earned from the sale of those prints.

As noted in Wesselmann, the "clear intent of the [ACAL] is to create a trust relationship even when the art merchant makes a financial investment in the art." Wesselmann, 172 Misc. 2d at 252; see also In re Freidman, 91 Misc. 2d at 204 (noting that the ACAL was enacted in order to "'protect artists who have a limited market and access to that market only through art dealers'" (quoting Memoranda of State Department, 1966 N.Y. Sess. Laws 1963-64 (McKinney)). Thus, under the ACAL, an art merchant's financial investment in an artist's work does not transform an otherwise valid consignment into an outright sale unless and "until the price [of such work] is paid in full." N.Y. ARTS & CULT. AFF. LAW §§ 11.01, 12.01(1) (emphasis added) (stating that payment in full is required to transfer title "[n]otwithstanding . . . any agreement, note, memorandum or writing to the contrary" and that any waiver of these protections by either the artist or art merchant is "absolutely void").

Here, Defendant's own statements and admissions clearly defeat any claim to ownership. Crucially, Defendant characterizes his purchase as giving him "an undivided half ownership interest in [the Disputed Prints]." (See ECF No. 215, Def.'s Rule 56.1 Statement No. 18; see also ECF No. 217, Def.'s Decl., dated Feb. 17, 2015 ("Def.'s 2015 Decl."), ¶ 7 ("I purchased an undivided ownership interest in those prints and

paid Anna Khaldei $7,500 for that half interest.").) Similarly, when asked how he distinguished between Plaintiff's prints and his own when allegedly returning half of the Disputed Prints to Plaintiff in 1999, Defendant stated: "It wasn't her half, it was a pile." (Def.'s Dep. 55:15-16.) Thus, accepting Defendant's own characterization of the parties' transaction, his purported $7,500 payment to Plaintiff was not payment in full for any specific print or prints; rather, it was a purchase of a half-interest in an undivided collection of prints. This is exactly the type of financial investment—as opposed to full purchase—that the ACAL is designed to protect artists against and which is insufficient to disrupt the creation of a trust relationship. N.Y. ARTS & CULT. AFF. LAW §§ 11.01, 12.01(1).

Notwithstanding the alleged $7,500 payment, therefore, Defendant's right to half of any sales revenue must be considered "simply another basis of compensation." Wesselmann, 172 Misc. 2d at 252. Consequently, the Court concludes that Kaspiev received the Disputed Prints from Plaintiff as a consignee rather than a co-owner, such that these prints remain Plaintiff's property.

### ii. Defendant's Liability for the Disputed Prints

Given the determination that Plaintiff owns the Disputed Prints, it follows that she is entitled to possession of any of the Disputed Prints that are in Defendant's or the Court's

custody or control.  In addition, Plaintiff may recover compensatory damages for any prints that are shown to be missing or are believed to have been disposed of by Kaspiev through undocumented transactions. See N.Y. ARTS & CULT. AFF. LAW § 12.01(1) (defining consigned work as "trust property in the hands of the consignee"); see also Scher v. Stendhal Gallery, Inc., 117 A.D. 3d 146, 161 (N.Y. App. Div. 2014) (permitting plaintiff to recover for "all prints that are missing or believed to have been disposed of through undocumented sales").

Defendant's liability for any missing or unaccounted for prints flows from his status as a consignee.  In New York, a consignment is considered, "essentially, an agency with a bailment." See United States v. Nektalov, 440 F. Supp. 2d 287, 298 (S.D.N.Y. 2006).  Moreover, New York law is clear that where "a bailee fails to return a bailor's property, there is a presumption of liability, and if the property cannot be found, a prima facie case of negligence exists." Maisel v. Gruner & Jahr USA, Inc., 89 A.D.2d 503, 504 (N.Y. App. Div. 1982).  It then becomes incumbent on the bailee to rebut this presumption by showing that the bailed property is not lost or that the cause of the loss was not within his control. See Isik Jewelry v. Mars Media, Inc., 418 F. Supp. 2d 112, 121 (E.D.N.Y. 2005); Maisel, 89 A.D.2d at 504.

15

Here, the parties agree that Plaintiff delivered 261 photographic prints to Kaspiev during their December 1997 meeting. (See Def.'s Dep., 115:3-21 (acknowledging that he accepted 248 signed photographs plus 13 unsigned prints); ECF No. 216, Dale 2015 Decl. Ex. 8.)  Nevertheless, Kaspiev asserts that the Disputed Prints make up only 122 of the 266 impounded photographs, with the other 144 prints coming from his personal collection of Khaldei's work. (See Def.'s Dep. 64:16-17, 116: 3-12.)  In explaining this shortfall, Kaspiev contends that he returned 135 of the Disputed Prints to Plaintiff in June 1999 (id. 116:3-12) and gave four of the Disputed Prints to an attorney, Gary Schonwald, in exchange for pro bono services sometime between 1998 and 2002 (id. 64:16-17).

Other than his own testimony, however, the only evidence that Kaspiev has submitted in support of these alleged transactions is a draft of a receipt found in Plaintiff's possession stating the she received works "in the amount – space – pieces" from Defendant. (See ECF No. 216, Dale 2015 Decl. Ex. 11.)  Defendant contends that this evidence is at least sufficient to raise an issue of fact as to whether these transactions took place.  But Defendant's argument overlooks his fiduciary duty as Plaintiff's agent to account to Plaintiff for the disposition of the Disputed Prints. See Restatement (Third) of Agency § 8.12(3) ("An agent has a duty, subject to any

16

agreement with the principal, . . . to keep and render accounts to the principal of money or other property received or paid out on the principal's account.").

Contrary to this duty, Defendant has admitted that he failed to keep or obtain any records or receipts documenting either his alleged gift of four prints to Mr. Schonwald or establishing that he returned prints to Plaintiff in 1999. (Oral Argument Tr. 14:2-15:15 (acknowledging that Defendant did not have "any evidence" from Mr. Schonwald confirming his receipt of four prints); Def.'s Dep. 73:13-74:5; see also ECF No. 197, Def.'s Answer & Counterclaims ¶¶ 20-21.)  Accordingly, the Court finds that Defendant has failed to adequately support his contention that he returned 135 of the Disputed Prints to Plaintiff in June 1999 and gave another four of the Disputed Prints to Mr. Schonwald. See I.C.C. Metals, Inc. v. Municipal Warehouse Co., 50 N.Y.2d 657, 664 n.3 (1980) ("The explanation proffered by the [bailee] in such a case must be supported by sufficient evidence and cannot be merely the product of speculation and conjecture.").  As a result, these explanations are inadequate as a matter of law to relieve Kaspiev of liability for the 139 Disputed Prints that he contends are not among the materials deposited with the Court.

### iii. Possession of the Impounded Prints

As this action approaches its fifth year, the Court notes with relief that significant strides have finally been made toward resolving the parties' competing claims over the 266 Khaldei photographs that Defendant has deposited with the Court. To the extent that further steps are needed, however, the parties once again have only themselves to blame.  Although the Court concludes that Plaintiff is the owner of all 261 of the Disputed Prints and finds that Kaspiev is liable for the 139 Disputed Prints that he contends are not deposited with the Court, neither Plaintiff nor Defendant has come forward on the present motion with evidence identifying which of the 266 photographic prints currently impounded by the Court—all of which were taken by Khaldei—came from the 261 Disputed Prints as opposed to Kaspiev's personal collection of Khaldei's work. This is true even for the 122 Disputed Prints that Defendant claims are among the materials deposited with the Court. (See Def.'s Dep. 116:3-17.)  Nor has either party offered a basis for calculating the amount of compensatory damages that Plaintiff should receive for any of the 261 Disputed Prints that are shown to be missing.

This failure must ultimately be corrected by Plaintiff, who—as the party seeking possession and damages—bears the burden of proof and must present to the Court a "proper basis for

ascertaining the damages [she] seeks to recover." See ESPN, Inc. v. Office of Com'r of Baseball, 76 F. Supp. 2d 416, 418 (S.D.N.Y. 1999); but see Fed. R. Civ. P. 56(d) ("If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact . . . that is not genuinely in dispute."). Importantly, although Plaintiff contends that "many" of the descriptions contained in a contemporaneous list of the prints delivered by Plaintiff to Kaspiev in December 1997 are "too general to match to specific prints in the Court's custody," she has offered no evidence or analysis in support of this conclusion. (See Pl.'s Mem. at 15l; ECF No. 216, Dale 2015 Decl. Ex. 8.)

Contrary to Plaintiff's contention, the Court agrees with Defendant that this contemporaneous list, which includes subject matter descriptions and dimensions for each of the 261 Disputed Prints, at least raises a question of fact as to whether it is possible to identify which of the 266 impounded photographs belong to Plaintiff. See Am. Capital Fin. Servs., Inc. v. Berry-Hill Galleries, Inc., No. 10 Civ. 2555, 2010 WL 4227307, at *4 (S.D.N.Y. Oct. 19, 2010) ("[A] court may not award summary judgment [on damages] to a plaintiff if the defendant offers evidence that raises a factual question as to the proper measure and amount of plaintiff's damages."). Accordingly, Plaintiff's

request for summary judgment granting her immediate possession
of 261 of the 266 impounded Khaldei photographs is denied.[5]

## 2.   The Corbis Negatives

In addition to seeking to recover the 261 Disputed Prints,
Plaintiff also seeks possession of the 3,031 negatives that are
currently impounded with the Court and which Defendant claims to
have "received from Corbis" (ECF No. 215, Def.'s Response to
Rule 56.1 Statement No. 34), together with compensatory damages
for missing negatives that Plaintiff alleges were selected by
Corbis under the License Agreement and returned to Defendant.
For the reasons discussed below, Plaintiff's request for
possession of the 3,031 impounded negatives is granted, but her
request for damages is denied.

### i.   Possession of the Impounded Negatives

The Court's previous decision denying Plaintiff's request
for possession of the 3,031 impounded negatives reflected a
desire to preserve the status quo while discovery was ongoing.
(ECF No. 123 at 15.)  Although the parties continue to quarrel,

---

[5] In reaching this conclusion, the Court also declines
Plaintiff's suggestion that Defendant may be made to surrender
prints from his personal collection of Khaldei's work in order
to compensate Plaintiff—which would avoid the need to determine
the ownership of each individual impounded photograph.  Unlike
the cases to which Plaintiff cites, the goods at issue here—
photographic prints—are discrete goods for which substitution is
not appropriate. Cf. Conroy v. Cadillac Fairview Shopping Ctr.
Prop. (Md.), Inc., 143 A.D.2d 726 (2d Dep't 1988) (addressing
the commingling of partnership funds).

the Court recognizes that more than four years has passed since
Defendant deposited with the Court all photographs and negatives
taken by Khaldei in his possession—a period of time that is more
than adequate to have afforded the parties a full opportunity to
inspect the impounded materials—and that discovery is now
complete.  Moreover, as Plaintiff's memorandum points out,
Defendant has expressly disclaimed any ownership interest in
these 3,031 negatives. (See ECF No. 215, Def.'s Response to Rule
56.1 Statement No. 34; see also ECF No. 118, Tr. 14:3-5.)  Thus,
in the absence of any dispute over ownership, Plaintiff's
application for possession of the 3,031 negatives currently in
the Court's custody is granted.

### ii.  Plaintiff's Request for Damages

Turning next to Plaintiff's request for compensatory
damages, the Court must first determine the extent of
Defendant's responsibility for the Corbis Negatives.  As an
initial matter, the parties apparently agree that Corbis
selected and scanned "at least 3,035 negatives under the License
Agreement." (See ECF No. 211, Rothstein 2015 Aff. Ex. 2,
Response to Pl.'s 2d RFAs, No. 14; see also Pl.'s Mem. at 2.)
Although Kaspiev denies that he is accountable for the return of
these 3,035 negatives, as the Court observed in its prior
summary judgment opinion, Kaspiev agreed to accept possession of
the Corbis Negatives "as the representative of Mr. Khaldei's

21

heirs" in October 1997. (ECF No. 66, Rothstein 2013 Aff. Ex. 5;
see also ECF No. 123 at 17.)  Kaspiev explains that he did so in
order to pursue the sale of these negatives, together with other
materials from the Khaldei Estate, to the Library of Congress.
(Def.'s Dep. 128:19-129:2.)  Having bargained for possession,
Defendant cannot now claim that the Corbis Negatives fall
outside his contract of service with the Khaldei Estate.

As with the 261 Disputed Prints, the Court therefore finds
that Defendant is responsible as both agent for the Khaldei
Estate and as a bailee for the return of the 3,035 negatives
selected by Corbis under the License Agreement and must account
for any of the Corbis Negatives that are shown to be missing.
See Baykam v. Martin/Molinary Art & Design Galleries, Ltd., No.
86 Civ. 1010, 1987 WL 12375, at *6 (S.D.N.Y. June 26, 1987)
(concluding that a defendant who "knowingly took possession" of
work consigned to another party "thereby assum[ed] the same
duties as bailee as [the original consignee]"); Restatement
(Third) of Agency § 8.12(3) and comment d ("An agent's fiduciary
duty . . . requires the agent to maintain records of dealings on
the principal's behalf and provide them to the principal upon
demand.").  In reaching this conclusion, the Court notes
particularly Kaspiev's admission that he kept the Corbis
Negatives in his exclusive possession until he was ordered to
deposit them with the Court in March 2011. (See Def.'s Dep.

22

87:2-5; see also ECF No. 18, Order dated Mar. 29, 2011.)  Having
maintained control over the Corbis Negatives for more than a
decade, Plaintiff can hardly be surprised that he must now
account for their disposition during that time.

Consequently, in light of Defendant's failure to produce
all 3,035 negatives selected by Corbis under the License
Agreement in response to Plaintiff's proper demand for their
return (see ECF No. 215, Def.'s Response to Rule 56.1 Statement
No. 34 (acknowledging that Defendant has deposited 3,031
negatives with the Court)), the Court finds that Plaintiff has
met her burden of establishing a presumption of liability
against Defendant. See I.C.C. Metals, Inc., 50 N.Y.2d at 664.
It is therefore incumbent upon Defendant to rebut this
presumption by showing that these negatives are not missing or
that the loss was caused by something other than his own
negligence. See Maisel, 89 A.D.2d at 504.  Upon review of the
full record, however, it is clear that Defendant has failed to
do so.

Although Kaspiev contends that some negatives may have been
misplaced by Corbis or lost during delivery, he admits that he
failed to keep any record of the negatives that he received from
Corbis. (See Def.'s Dep. 57:5-7 ("Q. Did you count the negatives
when you got them back from [Corbis]?  A. I did not.").)
Instead, Kaspiev relies on his own testimony that he contacted

23

Corbis at the end of 1997 after noticing that some of the
negatives listed on Corbis's website did not appear to be in his
possession (ECF No. 71, Def.'s 2013 Decl. ¶ 46) and on a letter
from Corbis confirming that it did not have "any outstanding
Khaldei images to return." (ECF No. 216, Dale 2015 Decl. Ex.
10.)  But the Corbis letter—the only documentary evidence
submitted by Defendant in support of his explanation—does not
actually indicate whether Corbis misplaced any of the negatives
it selected, let alone how many may have been misplaced. See
Baykam, 1987 WL 12375, at *5 (rejecting the defendant's
"barebones assertion that the missing painting was, in fact,
stolen" and noting that "the explanation of the loss must show
with reasonable certainty how it occurred").  Accordingly, the
Court finds that Defendant has failed to adequately explain his
failure to return to Plaintiff all 3,035 of the Corbis
Negatives.  As with the Disputed Prints, Plaintiff is therefore
entitled to recover from Kaspiev compensatory damages for any of
the Corbis Negatives that Plaintiff shows are missing from the
materials that Defendant deposited with the Court.

Despite this finding of liability, however, questions of
fact once again preclude the Court from granting summary
judgment on Plaintiff's request for compensatory damages for the
missing Corbis Negatives.  Critically, Plaintiff has not
established the specific number of Corbis Negatives that are

missing or unaccounted for. See Grace v. Corbis-Sygma, 487 F.3d 113, 119-121 (2d Cir. 2007) (noting that the bailor bears the burden to prove damages and noting that "[a] precise number of images is . . . necessary."). Contrary to Plaintiff's assertion that 855 of the Corbis Negatives are missing from the materials impounded by the Court, Defendant maintains that all 3,031 negatives that he deposited were "negatives Kaspiev received from Corbis." (ECF No. 215, Def.'s Response to Rule 56.1 Statement No. 34; see also Def.'s Dep. 100:5-101:24.) Thus, Defendant's statements suggest that four—and not 855—negatives may be unaccounted for. Additionally, Defendant continues to dispute the methodology used by Plaintiff to identify which of the 3,031 impounded negatives were selected and scanned by Corbis, noting that Defendant's own investigation identified matches between the negatives currently in the Court's custody and images bearing Corbis ID numbers that were not reflected in Plaintiff's initial assessment. (See ECF No. 211, Rothstein 2015 Aff. Ex. 1, Response to Pl.'s 1st RFAs, No. 10.) Consequently, the Court denies Plaintiff's request for summary judgment in the amount of $45,000 for lost Corbis Negatives because a question of fact remains regarding how many of the negatives selected by Corbis under the License Agreement have been deposited with the Court.

### 3.   Defendant's Counterclaim for Royalties

Plaintiff also requests summary judgment on Defendant's counterclaim that he is entitled under the Agency Agreement to 50 percent of the royalties paid to Plaintiff by Corbis from the time that the $25,000 advance was exhausted in 2005 until the agreement expires.  In support, Plaintiff contends that Defendant forfeited any compensation owed to him for his activities as an agent under the faithless servant doctrine. Alternatively, Plaintiff asserts that Kaspiev's counterclaim for royalties is untimely on the ground that the six-year statute of limitations began to run in 2003 when Defendant learned of the New Jersey action. (See Def.'s Dep. 87:6-13, 88:25-3.)

Plaintiff's "faithless servant" argument presents a significant challenge to Defendant's claim to a share of the Corbis royalties. See Samba Enters., LLC v. iMesh, Inc., No. 06 Civ. 7660, 2009 WL 705537, at *9 (S.D.N.Y. Mar. 19, 2009). Under New York law, an agent is obligated "'to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" See Carco Grp., Inc. v. Maconachy, 383 Fed. Appx. 73, 76 (2d Cir. 2010) (quoting Phansalkar v. Andersen Weinroth & Co., LP, 344 F.3d 184, 200 (2d Cir. 2003)). Moreover, "it is elemental that a fiduciary owes a duty of

26

undivided and undiluted loyalty to those whose interests the fiduciary is to protect," which precludes "not only blatant self-dealing, but also require[s] avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." See Birnbaum v. Birnbaum, 73 N.Y.2d 461, 466 (1989); Pokoik v. Pokoik, 11 A.D.3d 428, 429 (N.Y. App. Div. 2014) (same); see also Black's Law Dictionary 1390 (9th ed. 2009) (defining self-dealing as "[p]articipation in a transaction that benefits oneself instead of another who is owed a fiduciary duty").)  Among other allegations, Plaintiff contends that Kaspiev breached his duty of loyalty by wrongfully withholding the Corbis Negatives from Plaintiff despite her demand for their return in June 1999 and by subsequently disappearing with Khaldei "materials" belonging to Plaintiff. (See Pl.'s Mem. at 20.)  Once again, the Court agrees.

As noted by other decisions from this district, New York courts "continue to apply two alternative standards for determining whether an employee's conduct warrants forfeiture under the faithless servant doctrine." See Stanley v. Skowron, 989 F. Supp. 2d 356, 359 (S.D.N.Y. 2013).  The first—and more stringent—standard is satisfied where "the misconduct and unfaithfulness . . . 'substantially violates the contract of service' such that it 'permeate[s] [the employee's] service in

its most material and substantial part.'" See id. (quoting

Phansalker, 344 F.3d at 203) (alterations in the original).  By

comparison, the second standard requires that the agent's

misconduct "rise[] to the level of a breach of a duty of loyalty

or good faith." Phansalkar, 344 F.3d at 202 (2d Cir. 2003).   In

other words, it is sufficient that the employee "acts adversely

to his employer in any part of the transaction, or omits to

disclose any interest which would naturally influence his

conduct in dealing with the subject of the employment." Id.;

Stanley, 989 F. Supp. 2d at 360.  An agent who is found to be

faithless in the performance of his fiduciary duties is

generally liable for all compensation from the date of the

breach. See Carco Grp., 383 Fed. Appx. at 76.

Although New York courts have not defined the

circumstances, if any, in which courts should apply one or the

other of the two forfeiture standards, the Court need not

resolve this issue because the record clearly demonstrates that

Kaspiev is a faithless servant even under the more stringent

standard.  As an initial matter, the parties agree that

Kaspiev's counterclaim for a share of the Corbis royalties is

based on paragraph 3 of the Agency Agreement, which sets forth

Kaspeiv's compensation for acting as Khaldei's—and later

Khaldei's heirs'—"worldwide agent" in the promotion and sale of

photographs. (See Pls. Mem. at 16; ECF No. 71, Def.'s 2013 Decl.

¶ 25.)  Moreover, although Defendant was not expressly charged with the sale of negatives under the original terms of the Agency Agreement, as the Court observed above, Defendant agreed to assume control over the Corbis Negatives in order to pursue a sale to the Library of Congress, such that the Corbis Negatives must also be considered part of his contract of service. (See supra pp. 20-21.)

Looking at the record, it is clear that Kaspiev substantially and materially violated the terms of his agency with respect to both the Corbis Negatives and the Disputed Prints.  First, Kaspiev does not dispute that he failed to return the Corbis Negatives to Plaintiff as requested at their June 1999 meeting and thereafter kept them in his possession until 2011, when this Court ordered their impoundment. (Def.'s Dep. 87:2-5.)  Nor does he deny that he continued to try and sell these negatives in return for 50 percent of any sales proceeds. (Id. 157:18-161:14.)  Kaspiev instead asserts that he acted out of a duty of loyalty to Khaldei and uncertainty about Plaintiff's right to take possession of the negatives. (See id. 56:9-60:8 (asserting that he withheld the negatives because Plaintiff failed to produce any "official paper" establishing her authority).)  Moreover, he claims that he continued to pursue a deal to sell the negatives to the Library of Congress,

29

despite Plaintiff's prior objection, because that is what
Khaldei had wanted. (Id. 128:19-129:2.)

But Defendant's claims—even if true at the time—do not
explain his possession of the negatives for the next thirteen
years, starting from when he received the negatives from Corbis
at the end of 1997 (Def.'s Mem. at 24; Def.'s Dep. 100:5-8) and
continuing until March 2011, when Defendant was ordered to
deposit these and other Khaldei materials with the Court. See
Ball v. Cook, No. 11 Civ. 5926, 2012 WL 4841735, at *4, *9
(S.D.N.Y. Oct. 9, 2012) (noting that defendant breached his
fiduciary duty regarding artwork entrusted to him by the
plaintiff by "refus[ing] to turn over, following Plaintiff's
demand, Plaintiff's property remaining in his possession,
custody, or control").  Defendant's admission that he never
communicated with Plaintiff between 2001 and 2007 (Def.'s Dep.
87:2-13, 88:25-3.), together with his inability to recall ever
giving Plaintiff his address, telephone number, or any other
means of direct contact after moving to Manhattan in 2001
because "we did not associate" (id. 132:25-134:21), only further
highlight Kaspiev's failure to act with any degree of fidelity
during this period.

Likewise, Defendant also admits that he failed to return
all of the Disputed Prints to Plaintiff as she requested at
their June 1999 meeting. (Id. 56:2-5, 74:17-20.)  According to

Defendant, he withheld half of these prints because Plaintiff failed to return the $7,500 he had paid toward them, stating "[s]he will pay me [$7,500], and I'll give [her] the second half." (Id. 130:2-9.)  As discussed above, however, Defendant held these prints as a consignment and in trust for Plaintiff and the Khaldei Estate.  Under the ACAL, artwork held by an art merchant as trust property is not subject "to any claims, liens or security interest of any kind or nature whatsoever." N.Y. Arts & Cult. Aff. Law § 12.01(a)(v).  Accordingly, Kaspiev's claim that he had paid Plaintiff $7,500—even if true—did not entitle him to withhold from Plaintiff half of the Disputed Prints. See Zucker v. Hirschl & Alder Galleries, Inc., 170 Misc. 2d 426, 433 (N.Y. Sup. Ct. 1996) (concluding that the ACAL expressly precludes an art merchant from withholding an artist's work on the basis of a claim or security interest); see also Wesselmann v. Int'l Images, Inc., 259 A.D. 2d 448, 449 (N.Y. App. Div. 1999) (noting that the fact that the defendant may have been entitled to reimbursement "did not alter the trust relationship, and did not create a security interest in the art work in favor of that defendant").  Further, Kaspiev's alleged belief that he was a co-owner of these prints does not excuse his misconduct, as there is "nothing in New York law to suggest that an agent's specific intent to defraud is required to warrant forfeiture."

31

Phansalkar, 344 F.3d at 204 (citing Lamdin v. Broadway Surface
Adver. Corp., 272 N.Y. 133, 137 (1936).

Finally, although Defendant attempts to avoid liability by
claiming that Kaspiev's possession of the negatives has not
harmed Plaintiff, where an agent is found to be faithless, it is
no defense "'that the services were beneficial to the principal,
or that the principal suffered no provable damage as a result of
the breach of fidelity by the agent.'" See Phansalkar, 344 F.3d
at 200 (quoting Feiger v. Iral Jewelry, Ltd., 41 N.Y.2d 928,
928-29 (1977)). Where, as here, a Defendant has engaged in
multiple acts of disloyalty over a significant period of time—
lasting not just months, but years—and which "persisted boldly
through an opportunity to correct" that disloyalty, forfeiture
of any compensation owed during that time is clearly warranted.
See Phansalker, 344 F.3d at 202; Stanley, 989 F. Supp. 2d at
362; Tyco Intern., Ltd. v. Kozowski, 756 F. Supp. 2d 553,
(S.D.N.Y. 2010).

In reaching this conclusion, the Court declines to
apportion forfeiture so as to exclude the Corbis royalties. As
noted by the Second Circuit in Phansalkar, apportionment is
warranted only where: (1) the parties previously agreed that
the agent would "be paid on a task-by-task basis (e.g., a
commission on each sale arranged by the agent); (2) the agent
engaged in no misconduct at all with respect to certain tasks;

and (3) the agent's disloyalty with respect to other tasks 'neither tainted nor interfered with the completion of' the tasks as to which the agent was loyal." Phansalker, 344 F.3d at 205 (quoting Musico v. Champion Credit Corp., 764 F.2d 102, 114 (2d Cir. 1985)). Here, however, Kaspiev's misconduct clearly tainted the task for which he seeks compensation, as Defendant's counterclaim for royalties seeks payment for his work involving the very same negatives that he wrongfully withheld. Accordingly, Plaintiff's request to dismiss Kaspiev's counterclaim for a share of the Corbis royalties is granted. As a result, the Court need not address Plaintiff's alternative argument that Kaspiev's counterclaim for royalties is untimely.

### 4.    Damages and Other Relief

The "happy day" when this aged matter can be resolved is close at hand. (ECF No. 123 at 15.) Nevertheless, several additional issues remain that cannot be resolved on the present motion.

First, issues of fact preclude summary judgment on Kaspiev's claim that he paid Plaintiff $7,500 in December 1997 in exchange for an interest in the Disputed Prints. Specifically, despite Plaintiff's assertion that Kaspiev failed to document this alleged payment, Defendant maintains that it is incorporated in a December 14, 1997 receipt for $20,000. This receipt is in the record, is signed by Plaintiff, and states

33

that Plaintiff and her father "have together received $20,000
. . . in cash from Kalman Kaspiev, for the period beginning in
January 1997 and up until today." (ECF No. 216, Dale 2015 Decl.
Ex. 9.)  On its face, this receipt reasonably suggests that
Plaintiff did receive money from Kaspiev during their meeting in
December 1997 and is sufficient to create a question of fact
that precludes summary judgment at this time.

Second, Plaintiff is also not entitled to summary judgment
on her claim for lost licensing revenue based on the assertion
that Kaspiev failed to promote Khaldei's work.  Plaintiff
asserts that "Kaspiev did not provide captions" for 1,169 images
on Corbis's website (Pl.'s Mem. at 18), which she contends has
caused her to lose approximately $10,000 in potential revenue
under the License Agreement.  Looking at the plain language of
the Corbis Agreement, however, it clearly states that the
"Licensor [i.e., Khaldei] will deliver caption information
related to each selected image," with Kaspiev's responsibility
being to "translate all caption information into English." (ECF
No. 66, Rothstein 2013 Aff. Ex. 3 ¶ 6.)  Thus, the absence of
captions in and of itself does not establish that Kaspiev
breached his obligations under the Corbis Agreement to promote
Khaldei's work.  Instead, Defendant has stated that he "provided
English translations of Khaldei's captions for those negatives
that Corbis asked Defendant to translate." (See ECF No. 211,

34

Rothstein 2015 Aff. Ex. 2, Response to Pl.'s 2d RFAs, No. 7.)
At the very least, then, summary judgment is precluded by the
existence of an issue of fact as to whether there were
additional images for which captions were provided by Khaldei
but not translated by Kaspiev.

Finally, the Court denies Plaintiff's request for an order
requiring Kaspiev to surrender to Plaintiff any negatives taken
by Khaldei in Defendant's possession, custody, or control.  The
requested relief has already been addressed by the Court's March
29, 2011 order directing Defendant to deposit these same
materials with the Court (see ECF No. 18) and by the present
order granting Plaintiff possession of all 3,031 impounded
negatives (see supra pp. 19-20.)

### III. Conclusion

For the foregoing reasons, Plaintiff's motion for
possession of the 3,031 negatives currently in the Court's
custody and her request to dismiss Defendant's counterclaim for
a share of the Corbis royalties is granted.  At the same time,
the Court denies Plaintiff's requests for (1) immediate
possession of 261 of the impounded photographic prints,
(2) damages for the missing Corbis Negatives and for lost
licensing revenue, (3) injunctive relief, and (4) an order
precluding Defendant from seeking a refund of the $7,500 that he
allegedly paid toward a share of the Disputed Prints.  Counsel

are directed to appear in Courtroom 20-C on November 5, 2015 at
11:45 a.m. for a conference to set a time for trial on all
remaining issues.  The parties are also directed to engage in
good faith settlement negotiations prior to the next conference.


**SO ORDERED.**

Dated:     New York, New York
           September 28 , 2015

                                   _____
                                         John F. Keenan
                                   United States District Judge